**SO ORDERED.**

**SIGNED this 21 day of January, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **JOSEPH C. GILKEY,** | ) | Case No. 05-15975 |
| **GLADYS Y. GILKEY,** | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| **J. MICHAEL MORRIS, Trustee,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 08-5009 |
| | ) | |
| **TINA GILKEY,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

J. Michael Morris, trustee of the bankruptcy estate of Joseph C. Gilkey in the above-captioned case, filed this adversary proceeding to avoid two transfers of the debtor's property to his

-1-

daughter, defendant Tina Gilkey, one that occurred pre-petition and one that occurred after debtor's chapter 7 filing. J. Michael Morris appeared for himself, along with co-counsel Sarah J. Newell. Defendant Tina Gilkey appeared by Michael J. Studtmann. After careful consideration of the evidence presented at trial along with the parties' stipulations of fact[1] and applicable legal authorities, the Court is now ready to rule.

Jurisdiction

The trustee proceeds in this adversary under 11 U.S.C. §544(b) and state law as to the pre-petition alleged fraudulent transfer, and under § 549 as to the alleged unauthorized post-petition transfer. If the pre-petition transfer to defendant is not avoided, the trustee requests a sale of the jointly owned property under § 363(h). These claims are core proceedings and the Court has jurisdiction under 28 U.S.C. § 157(b)(1) and (b)(2)(A), (H) and (O) and 28 U.S.C. § 1334(b).

Findings of Fact

A.   The Debtor and his Bankruptcies

Joseph Gilkey is 76 years old and the Bishop of the Kansas Southwest District of the Church of God in Christ.[2] He has been a minister for fifty years. Until June of 2008, he was the pastor of St. Mark Church of God in Christ in Wichita. At one time many years ago, Joseph held a real estate license, but he did not have a business or accounting background. During the 1960's he attended Friends University, Wichita State University and the Wichita Bible College.

In 1993 Joseph purchased residential real estate on North Fountain in Wichita, Kansas for

---

[1] Dkt. 18.

[2] Joseph testified that the Kansas Southwest District encompasses some 40 churches. Kansas Southwest District is governed by 7 superintendents who act as directors of all activities.

$3,000 and assumed the existing mortgage on the property ("Fountain Property").[3] According to Joseph, he purchased this property for his adult daughter Tina and she gave him the $3,000. In 1995, he refinanced, executing a note and mortgage in the amount of $28,569. Tina was not a party to the note and mortgage and was not on the 1993 deed.

Joseph C. Gilkey filed his chapter 7 case on September 17, 2005,[4] one month prior to the effective date of the 2005 BAPCPA.[5] Joseph listed the Fountain Property as his own on Schedule A and noted that his daughter lived there. Joseph never resided in the property, nor did he claim it as exempt. Only his daughter and her children have lived in the Fountain Property from the time Joseph bought it in 1993. When Joseph listed the Fountain property on Schedule D as collateral for the mortgage to Midland Mortgage, he stated that it was a "rental." Joseph valued the Fountain Property at some $28,000 on his schedules but testified at trial that it was worth $30,000 if foundation/basement repairs of $10,000 to $15,000 were made. Joseph declared his intent to retain the Fountain Property on his statement of intention. The only other real property listed on Schedule A by Joseph was a Florida timeshare, which he deeded back to the secured creditor.

Joseph disclosed an interest in JC Gilkey Ministries, Inc., but having no value. He disclosed his wife's University Plaza Boutique, a business enterprise operated by his wife since 2001 that apparently went out of business at some point.[6] Joseph owned and claimed exempt one vehicle, a 2000 Mitsubishi secured to Southwest National Bank. No other non-exempt assets or property of

---

[3] Ex. E.

[4] Ex. 3.

[5] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[6] The trustee, after investigation, concluded that the boutique inventory had no value to the estate.

-3-

Case 08-05009   Doc# 33   Filed 01/21/09   Page 3 of 20

any significance was listed.

Joseph scheduled approximately $104,000 in unsecured debt, which consisted almost entirely of credit card debt and charge accounts. He testified that he incurred the credit card debt in 2003 and 2004.

Not disclosed in Joseph's schedules was restaurant equipment acquired pre-petition by Joseph to start a restaurant business. Nor was Joseph's substantial involvement in the restaurant disclosed. In 2002, in an effort to raise money for his church, Joseph incorporated and opened a cafeteria/restaurant, Cisro's, in Northeast Wichita.[7] Joseph was the president and sole director of Cisro's. In addition, Joseph incorporated another entity in 1998, Air Capitol Community Development, Inc.[8] Joseph was a director of Air Capitol along with several other Kansas Southwest District clergymen or church-related individuals.[9] Joseph was also the president of Air Capitol. Air Capitol's purpose was not altogether clear, but the Court gleaned that Air Capitol was to buy and hold the building where Cisro's was located and operate the restaurant. Joseph testified that Air Capitol had a lease with an option to purchase the Cisro's site from the City of Wichita. It is not apparent from the record what happened to Air Capitol. Due to Joseph's inexperience in business, Cisro's failed to make the appropriate tax reports and soon fell behind on its sales and withholding tax obligations.[10] As a result, Joseph filed an individual chapter 13 case on March 6, 2007 in this

---

[7] Ex. 10.

[8] Ex. 12.

[9] Notwithstanding the corporate filings for Cisro's and Air Capitol, Joseph contends that the Kansas Southwest District of the Church of God in Christ "owns" Cisro's and Air Capitol and directed all activities.

[10] Ex. 9. The proofs of claim establish that these tax obligations were incurred 2003-2006. It appears that Cisro's ceased operating in early 2007. In addition to the Cisro's related

-4-

District.[11]

As was done in his chapter 7, Joseph listed the Fountain Property as his on Schedule A, this time without reference to Tina's occupancy, but indicating it was jointly owned.[12] He valued the Fountain Property at $30,000. Joseph did not claim it exempt. He disclosed the Midland mortgage on Schedule D and listed the payment obligation on Schedule J as a payment due on a "non-residential mortgage." Unpaid 2006 real estate taxes were listed in Schedule E and the attendant proof of claim links those unpaid taxes to the Fountain Property.[13] On question 2 of the statement of financial affairs, Joseph disclosed some $5,280 of rental income in 2004.[14] In addition, Joseph listed restaurant equipment of $5,000 on Schedule B. Joseph indicated that this was the restaurant equipment from Cisro's that he had owned since 2002. When Joseph filed an amended Chapter 13 plan, he noted a two payment arrearage on the first mortgage that was to be paid under the plan.[15] The chapter 13 case has since been dismissed due to Joseph's inability to make plan payments.

Also omitted from his chapter 7 case was a lawsuit commenced by Joseph in May of 2005 against Emmanuel Church of God in Christ over governance. Joseph sought a determination that

---

tax debt, Joseph also had income tax liabilities for years 2003-2006.

[11] No. 07-10422 (Bankr. D. Kan.).

[12] He did not identify the joint owner of the property. Nor was Tina's purported interest in the Fountain Property apparent from Joseph's plan.

[13] *See* Ex. 9.

[14] Presumably, this was the sum paid by Tina on the Fountain Property since no other rental property was identified in either case.

[15] Ex. 7.

-5-

as Bishop of the Kansas Southwest District he became the pastor of Emmanuel upon the previous pastor's death or could appoint a pastor for Emmanuel. Emmanuel filed a counterclaim against Joseph alleging a tortious interference with property and seeking damages in excess of $75,000. The Emmanuel suit was pending at the time Joseph filed his chapter 7 but not disclosed in his statement of financial affairs or schedules. Emmanuel filed a claim in Joseph's chapter 13 case.[16]

B. The 2004 Deed

Prior to filing this chapter 7 case, Joseph transferred a one-half cotenancy interest in the Fountain Property to his daughter, defendant Tina Gilkey. The parties stipulate that Joseph received no consideration for this transfer. The deed (the "2004 Deed") was recorded on March 12, 2004, approximately 18 months before the date of the petition.[17]

Because the transfer occurred more than one year before the filing, he did not list the transfer when he answered Question 10 on the statement of financial affairs in his chapter 7. He did not disclose the conveyance in any other place on the schedules, nor did he disclose Tina's co-ownership interest in the Fountain Property. The trustee only discovered the 2004 Deed when he secured title information as part of his administration efforts.

According to Joseph and Tina, she supplied Joseph with all the mortgage payments, usually in cash. They both testified that they intended to keep the Fountain Property in Joseph's name initially because Tina was divorcing her husband, and they wanted to insure he had no access to or rights in the property. They considered the Fountain Property to be Tina's. When Tina's divorce was complete, Joseph intended that she become the title-holder. Tina was divorced in the mid or

---

[16] Ex. 9.

[17] Ex. 1.

-6-

late 1990's. Eventually, at some time prior to the date of his chapter 7 petition, but several years after Tina's divorce, Joseph decided that Tina should have the property in her name and Joseph consulted with a neighborhood businessman and adviser who drafted the 2004 instrument that deeded the property from Joseph to himself and Tina as tenants in common.[18] The adviser suggested that Joseph retain some interest in the property by granting her a co-tenancy and assured Joseph that this would accomplish giving Tina the property.

Tina would pay Joseph an amount in cash equal to the mortgage loan payment, approximately $350. Joseph testified that Tina could not handle her checking account and therefore deals in cash.

### C. The 2007 Deed

On June 1, 2007, during the pendency of his chapter 13 case, Joseph filed a second deed of record by which he quit-claimed whatever remaining interest he had in the Fountain Property to Tina (the "2007 Deed").[19] This deed is dated May 19, 2004, but was acknowledged on the same date in 2005, and Joseph testified that it was made in 2005. Thus, the deed was not recorded until two years later.

The lengthy delay in recording was not satisfactorily explained at trial. Joseph could not remember and Tina says that she thought the deed was necessary to assure her full title in the property. Joseph thinks Tina typed the deed. Both Joseph and Tina testified that Joseph was given to procrastination and simply never got the deed to her to record. From the presence in the record

---

[18] The adviser, Harrold Jones, was formerly a petition preparer in this Court. He is not an attorney.

[19] Ex. 2.

-7-

of a Subordinate Mortgage to the Federal Home Loan Bank of Topeka made by Tina, the Court concludes that Tina sought to have some renovation done on the Fountain Property through a program of Mennonite Housing. She borrowed $3,000 and made a mortgage to FHLB on March 5, 2007 and that instrument was recorded on June 25, 2007.[20] Tina exhibited considerable confusion concerning the nature of the documentation and her purported borrowing from FHLB. She testified that she made only the first mortgage payment to her father; she did not recall making any payments on the FHLB mortgage.[21] The Court suspects that the second mortgage prompted the second deed. This suspicion is directly supported by the fact that both the second mortgage and deed have cover sheets directing the register of deeds to return the recorded instruments to Mennonite Housing.[22]

D.       Payment for the Fountain Property

Tina argues that notwithstanding her father's retention of a one-half interest in the property in 2004, she is truly the owner because she has made all of the mortgage payments and she maintains the property. Tina has been employed full-time by Head Start for nine years earning $22,000 annually. She testified that she paid to her father a monthly cash amount sufficient to pay each mortgage payment and her father then paid the mortgage company. Tina concedes that sometimes she is late paying him and he helps her out. She also concedes that she may have missed a payment or two, perhaps explaining the arrearage that was reported in the chapter 13. The Court takes at face

---

[20] Ex. H.

[21] The terms of the Subordinate Mortgage state that the "Note [secured by the mortgage] provides for no payments if the Borrower [Tina] complies with the terms of the Note." *See* Ex. H. In further questioning of Tina by the Court, she indicated that in order to get assistance from Mennonite Housing, the Fountain Property had to be in her name. Mennonite Housing paid for the repairs directly using the mortgage money she borrowed.

[22] Ex. G and H.

-8-

value Tina's assertions concerning the payments.

The Court heard no evidence concerning who paid the real estate taxes and insurance on the Fountain Property and the Court observes that Joseph listed the unpaid 2006 real estate taxes on the Fountain Property as a debt in the chapter 13.

    E.    <u>What the Trustee Knew</u>

Tina claims by way of affirmative defense that the § 546 statute of limitations on the Trustee's action to avoid the 2004 Deed had run by the time the Trustee commenced this proceeding. Therefore, the Trustee's knowledge concerning the circumstances is important. The 2004 Deed was filed for record on March 12, 2004, and, as detailed above, did not immediately become apparent to the Trustee in the schedules or by other means. Indeed, the Trustee testified that his first knowledge of either of the two deeds came only when he secured title work preparatory to noticing the property that he thought was Joseph's for sale. The Trustee did not secure the title work until 2007. He was appointed on September 17, 2005. In the absence of any tolling factors, his time in which to file an action to avoid the 2004 deed was two years from that date, or September 17, 2007. The Trustee did not state on what date he obtained the title evidence, but because he testified that the title evidence referred to the 2007 Deed that was recorded on June 1, 2007, we may assume he received the title evidence after that time.[23] The Court cannot ascertain whether the Trustee had the evidence in hand on September 17, 2007, the last day of the two-year limitations period.

In administering this property, the Trustee proceeded on the assumption that it belonged to Joseph. From the schedules and the debtor's comments at the first meeting of creditors, he

---

[23] In the course of securing the title evidence, the Trustee also discovered Joseph's chapter 13 bankruptcy filing.

-9-

concluded that only a small debtor's equity existed in the property and, rather than move to sell it, he determined to wait until the mortgage-holder sought relief from the stay.[24] In addition, debtor's former counsel in the chapter 7 approached the Trustee with the suggestion that Joseph would "work something out" so as to retain the property for his daughter's use.[25] The Trustee testified that in his conversations with Joseph's counsel, he was led to believe that Joseph owned the entire property. This suggests that Joseph had not apprised his prior counsel of the 2004 Deed. The Court did not have the benefit of Joseph's former counsel's testimony. Midland never filed a stay relief motion and the offer to "work something out" never materialized.[26]

Joseph admitted in his testimony that nothing in his schedules or statement of affairs in the 2005 case would have suggested anything other than his sole ownership of the Fountain Property. In addition, Joseph had acquired restaurant equipment to establish his restaurant well before he filed his 2005 case. He disclosed neither his ownership of the equipment nor his involvement in Air Capitol Community Development, Inc. on his schedules in either of the bankruptcy cases.[27] Nor did Joseph disclose in his chapter 7 case, his involvement with Cisro's, the restaurant that caused his chapter 13 filing, even though that corporation was incorporated in 2002 and he was the

---

[24] The Trustee's witness, a real estate broker, valued the property at $38,000-$43,000. The broker testified that repairs to the basement or foundation walls would cost $6,000 to $12,000.

[25] In his statement of intention, Joseph stated that he intended to retain the Fountain Property.

[26] The Trustee testified that he offered to split the $10,000 equity in the property based upon the county's tax appraisal of $35,000. Joseph never responded to that offer.

[27] Air Capitol was incorporated in 1998 by Joseph and he was a director. Ex. 12.

-10-

incorporator, the president, and the sole director.[28] While Joseph testified that he held no equity interest in these corporations, he clearly had significant involvement in them. Disclosure of these associations should have been included in an accurate answer to Question 18 of the statement of financial affairs. While he did disclose his involvement with his ministries and his wife's boutique, no mention was made either of Air Capital or Cisro's in his answers. This suggests to the Court that Joseph's attention to making a fully detailed financial disclosure in connection with these bankruptcy cases was casual at best, especially when viewed in concert with his inaccurate representation on his 2005 petition that he owned the entire interest in the Fountain Property and it was rented to his daughter.

Analysis

The Trustee seeks to avoid both the 2004 and 2007 deeds, but on different theories. He targets the 2004 Deed as a fraudulent transfer under § 544(b) and state law. He challenges the 2007 Deed as an unauthorized post-petition transfer under § 549. Tina responds that the fraudulent transfer action is barred by the two-year statute of limitations imposed by § 546(a). In addition, she asserts as to both transactions that the property has at all times been owned by her and has never been property of the bankruptcy estate.

    A.    The Statute of Limitations

Section 546(a) provides as follows:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of--

(1) the later of--

---

[28] Ex. 10.

-11-

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.[29]

Here, subsection (a)(1)(A) applies to place a two-year statute of limitations on the filing of the § 544 action as to the 2004 Deed. The case was filed on September 14, 2005 and the Trustee was appointed the same day. He did not file this action until January 11, 2008, indisputably later than two years after his appointment. The Trustee claims that Joseph's conduct surrounding the Fountain Property is grounds for equitable tolling of the statute.

The courts recognize that the doctrine of equitable tolling applies in bankruptcy cases and, in particular, to § 546. In *In re M&L Business Machine, Inc.*, the Tenth Circuit held that when a trustee, despite his due diligence and effort does not become aware of a cause of action due to fraud or other extraordinary circumstances beyond the trustee's control, the statute is tolled until the time of discovery of the action.[30] This conclusion is grounded in the Supreme Court's general declaration in *Holmberg v. Armbrecht* that a party who has been injured by fraud, but who remains in ignorance of the claim without want of diligence is entitled to equitable tolling even where the tortfeasor has made no special effort to conceal the claim.[31]

While the Court cannot find there to have been a considered effort to defraud or deceive the

---

[29] 11 U.S.C.A. § 546

[30] *Jobin v. Boryla (In re M&L Business Machine Company, Inc.),* 75 F.3d 586, 591 (10th Cir. 1996) (recognizing doctrine of equitable tolling of § 546 limitations period for trustee's avoidance actions and remanding case for determination on equitable tolling).

[31] 327 U.S. 392 (1946).

-12-

Case 08-05009   Doc# 33   Filed 01/21/09   Page 12 of 20

Trustee on Joseph's part, it is clear that unless the Trustee had immediately secured the title work on the Fountain Property, nothing in Joseph's representations in either of his bankruptcy petitions or his counsel's communications with the Trustee would have placed the Trustee on notice of the existence of the 2004 Deed or Tina's interest in the Fountain Property.  At best, Joseph affirmatively concealed Tina's purported ownership interest in the Fountain Property and his nondisclosure rises to the level of a material omission that he was obligated to disclose.  Recall that Joseph omitted to disclose this deed and Tina's interest not only in his first case, but also in the second.  Indeed, Joseph's disclosure in his 2005 bankruptcy represented that Tina was nothing more than a tenant and the Fountain Property was a rental property.  Nor was Joseph forthcoming concerning Tina's true interest in the Fountain Property when his attorney represented to the Trustee that Joseph would "work something out" to enable Joseph to retain the property for Tina's continued occupancy. While perhaps not as egregious as the active fraud alleged in *M&L Business Machine,* the Court nonetheless finds the debtor's conduct sufficiently culpable to toll the statute of limitations.[32]  This Court therefore concludes that the § 546(a) limitations period was equitably tolled until the point in time that the Trustee secured his title work in 2007.  Nothing that went before could have placed him on inquiry notice of the possibility of avoiding this claim.[33]  Therefore, the § 544(b) cause of action is timely filed and the Court will consider the merits of it.

  B. Tina Gilkey's Equitable Interest

---

[32] In *M&L Business,* the trustee alleged that debtor's misrepresentation of assets, concealment of pertinent documents, and destruction of relevant records, hampered her ability to investigate the bankruptcy estate. 75 F.3d at 591.

[33] *See In re Geneva Steel LLC,* 389 B.R. 231, 240-41 (Bankr. D. Utah 2008) (The trustee's duty to exercise reasonable diligence is triggered when the trustee is put on inquiry notice.).

-13-

Tina's principal defense to the Trustee's claims is that she, and not Joseph, owned the Fountain Property at the petition date and at all prior times. Under Tina's theory, the Fountain Property never became property of the estate subject to administration by the Trustee. There can be no doubt that Joseph was the sole record title holder upon its purchase and that Tina had no legal title to the Fountain Property until the 2004 Deed. Likewise, there is no question that Tina has occupied the property since before the petition date (and before the date of the 2004 Deed). The Court takes at face value her assertion that she has made *many* of the payments and has maintained the property. It is also clear that Joseph has helped his daughter make house payments on occasion. Indeed, at the time of his chapter 13 filing in 2007, he proposed a plan that would, in part, cure an arrearage owed to Midland Mortgage.

On this record, the Court cannot determine whether Tina Gilkey has in fact made *all* of the payments on the Fountain Property. The existence of an arrearage in 2007 and the absence of records supporting her claim leave this open to question. Her testimony is contrary to what Joseph set forth in both his bankruptcy petitions, that he was the owner of the property and that she lived in it. He refers to her as renting the property in several places on the schedules. Kansas law holds that the incidents of real property ownership include the rights of possession, use, enjoyment of its products, combined with legal title and the right of alienation.[34] On this record, it appears that Joseph long ago gave Tina the right of possession, use and enjoyment, but did not attempt to give her legal title until 18 months before the filing. And, when he did so, he only granted her a cotenant interest in the property, retaining one-half for himself, suggesting a desire on his part to retain some

---

[34] *Central Kansas Power Co. v. State Corp. Comm'n,* 221 Kan. 505, 515-16, 561 P.2d 779 (1977).

-14-

Case 08-05009   Doc# 33   Filed 01/21/09   Page 14 of 20

form of control. Joseph had not deeded the property to her before because of his concern that it would somehow be caught up in Tina's divorce. She was divorced in the mid or late 1990's, but no deed was drafted until the 2004 Deed. Although he stated that he thought the effect of the 2004 Deed was to convey the property to her, the deed's language clearly stated otherwise. Thus, the only incident of ownership held by Tina at the petition date was the right to possession and legal title to one-half of the real property.

The factual circumstances here differ from the line of Kansas cases involving contracts for deed that recognize a seller who holds legal title to property retains a secured interest in the property to protect the seller's interest in the purchase price and the purchaser in possession is the equitable owner of the property and enjoys all incidents of ownership.[35] First and foremost, there is no evidence here that Joseph and Tina ever entered into a contract for sale of the property. Second, by conveying the Fountain Property to Tina and himself as cotenants in 2004, Joseph retained not only legal title to the property, but also retained the right of possession if he chose to exercise that incident of ownership.[36] The purported explanation for Joseph's retention of an interest in the property, to ensure that Tina's ex-husband would have no claim to the property, is unconvincing where the 2004 Deed was executed some five years after Tina's divorce was final. Finally, and most compelling, Joseph's bankruptcy schedules belie Tina's claim of exclusive ownership of the Fountain Property. She was identified as a tenant. Joseph claimed ownership of the property and

---

[35] *See Graham v. Claypool,* 26 Kan. App. 2d 94, 978 P.2d 298 (1999); *Roberts v. Osburn,* 3 Kan. App. 2d 90, 589 P.2d 985, *rev. denied* 225 Kan. 845 (1979); *Capitol Federal Sav. And Loan Ass'n, Inc. v. Glenwood Manor, Inc.*, 235 Kan. 935, 686 P.2d 853 (1984).

[36] *See King v. Robbins,* 193 Kan. 70, 392 P.2d 154 (1964) (Ownership of real property involves not only immediate right of possession but right to control its disposition in the future).

-15-

described it as a rental property. There was no evidence presented that Tina paid the taxes or insurance on the Fountain Property, and at least for 2006, the real estate taxes were unpaid and listed as a tax debt in Joseph's chapter 13 case.[37]

Evidence of equitable ownership that is contrary to the legal record must be compelling.[38] The evidence here is not. Tina did not have a sufficient equitable interest in the property at the petition date to be the owner of the Fountain Property.

    C.    <u>Avoiding the 2004 Deed as a Fraudulent Transfer</u>

The Trustee seeks to avoid the 2004 Deed as a fraudulent transfer at state law under the Kansas Uniform Fraudulent Transfer Act ("KUFTA") pursuant to the avoiding powers conferred by § 544(b). At trial, the Trustee primarily argued that the transfer of the one-half cotenant's interest was avoidable under KAN. STAT. ANN. § 33-205 and, in the alternative, under KAN. STAT. ANN. § 33-204(a)(2)(A). Section 33-205(a) avoids transfers for the benefit of pre-existing creditors that are made by the debtor (1) without receiving a reasonably equivalent value in exchange for the transfer; and (2) while the debtor was insolvent or became insolvent as a result of the transfer. Section 33-204(a)(2)(A) avoids transfers for the benefit of both pre-existing creditors as well as future creditors of the debtor that are made (1) without receiving reasonably equivalent value in exchange and (2) while the debtor was (a) engaged or about to be engaged in a business for which his remaining assets were unreasonably small, or (b) intended to incur debts beyond the debtor's

---

[37] *See Christy v. Richolson*, 48 Kan. 177, 29 Pac. 398 (1892) (Payment of taxes is prima facie evidence of ownership.).

[38] *See Cimarron Feeders v. Bolle*, 28 Kan. App. 2d 439, 446, 17 P.3d 957 (2001) (The standard of evidence required to attack the effect of a written document is clear and convincing evidence); *Schulte v. Franklin*, 6 Kan. App. 2d 651, 633 P.2d 1151 (1981) (Evidence offered to show that deed was understood and agreed to be a mortgage must be clear and convincing.).

-16-

ability to pay as they came due.

In order to prevail on either of these theories, the Trustee needed to demonstrate that Joseph did not receive reasonably equivalent value from Tina in exchange for the 2004 Deed and that the debtor was insolvent at the time he made the deed. In order to render the transfer avoidable as to his future creditors, the Trustee also needed to show that when Joseph made the deed, he was involved in an undercapitalized business or intended to incur debts beyond his ability to pay.

A third basis for avoiding the 2004 Deed can be found at § 33-204(a)(1). This subsection avoids a transfer for the benefit of present and future creditors of the debtor if it is shown that the debtor made the transfer with intent to hinder, delay, or defraud his creditors. Determining the debtor's actual intent in making the transfer involves the consideration of any of eleven statutory badges of fraud, set out in § 33-204(b), as well as any other factors the Court deems relevant.

In considering the presence of the statutory badges, the Court makes the following conclusions. The transfer was made to an insider, Joseph's daughter. By retaining a one-half in the Fountain Property, Joseph retained control of it. At and before the time of the 2004 deed, Joseph was in arrears for taxes arising out of his business interests. Joseph was insolvent at the time of the transfer.[39] Joseph's's asset disclosure was inaccurate and incomplete. The parties stipulated that no consideration was received in exchange for the 2004 Deed and, at least on the basis of the stipulation, Tina cannot be said to have given reasonably equivalent value. As of March 12, 2004, Joseph was in arrears for his own federal and state income taxes and had been since the late 1990s. According to the proofs of claim filed in the 2007 chapter 13 case, he was also in arrears for sales and withholding taxes on account of Cisro's for years 2003-2006. Joseph also acknowledged that

---

[39] KAN. STAT. ANN. § 33-202.

-17-

his $104,000 unsecured debt was incurred in 2003 and 2004. Joseph's liabilities exceeded his non-exempt assets. The presence of these badges of fraud weigh heavily against Tina's continued physical possession of the property, particularly given that Joseph represented to the Court on his chapter 7 schedules that the Fountain Property was a rental and that she was his tenant and that he did not disclose the deed to her. Under these circumstances, the Court concludes that Joseph made the 2004 Deed with intent to hinder, delay or defraud his creditors under KAN. STAT. ANN. § 33-204(a)(1) and that the deed may be avoided on that basis alone.

By resolving the 2004 Deed in that way, the Court need not be as concerned about that portion of the Trustee's claim that is based on KAN. STAT. ANN. § 33-204(a)(2) or § 33-205(a). As noted above, the proof of these elements is a little sketchy. Although the parties stipulated that Joseph received no consideration in exchange for the 2004 Deed,[40] Tina testified that she regularly paid her father an amount equal to the mortgage payment and had done so since she took possession of the house many years ago. Unfortunately, she did not present evidence of how much she had paid at the time of the transfer (or afterward). Because the payments were made in cash, she lacked the corroborative evidence needed to sustain that position. Tina could as easily be found to be a renter whose rent equaled the mortgage payments. In fact, the disclosure of rental income in Joseph's chapter 13 case lends some credence to this theory. Assuming the Court was satisfied that Tina did not give reasonably equivalent value for the deed, it can certainly conclude that Joseph was insolvent at the time of the 2004 Deed, given his admission that the credit card debt was incurred in 2003 and 2004 and his tax liabilities extended back to years 2003 and 2004. The Court could also conclude that Joseph was insolvent at the time of the 2004 Deed based on his numerous debts that preceded

---

[40] Dkt. 18, ¶ 6.C.

-18-

his 2005 petition by several years. Finally, the Court could infer that Joseph's plan to set up a and operate Cisro's at a time somewhat contemporaneous with the 2004 Deed amounted to his engaging in a business that was undercapitalized. But the Court need not reach either the § 33-204(a)(2) nor the § 33-205(a) claim because there is more persuasive proof that Joseph made the conveyance with intent to hinder, delay or defraud under KAN. STAT. ANN. § 33-204(a)(1). On that basis alone, the 2004 Deed should be avoided and the cotenant interest granted to Tina should be preserved for the benefit of the estate.

        D.      <u>Avoiding the 2007 Deed as a Post-Petition Transfer</u>

Section 549 avoids transfers of estate property that occur post-petition without court approval. There appears to be no contest that Joseph delivered the deed to Tina after he commenced his chapter 7 and chapter 13 cases and that it was recorded on June 7, 2007, well after both bankruptcy cases were filed. Nor was court approval obtained for the 2007 Deed.

Once the Trustee made his prima facie case, the burden shifted to Tina to demonstrate that the transfer was valid by showing that she took the 2007 Deed for value, in good faith, and without knowledge that it could be avoided.[41] However, Tina did not present a defense to the post-petition transfer on the basis of § 549(c). Instead, Tina defended the post-petition transfer solely on the basis that the Fountain Property was never property of the estate and that she was the owner of it. Having previously found against Tina on the equitable ownership issue, the Trustee must prevail on his § 549 claim. Therefore, the 2007 Deed may be avoided and recovered for the benefit of the estate.

<u>Conclusion</u>

The Court is very sensitive to the fact that the Fountain Property has been Tina Gilkey's

---

[41] Section 549(c).

home for many years. Nevertheless, the Court must conclude on the evidence before it that Tina Gilkey was not the owner of the Fountain Property before she received the deeds. This means that the deeds each constituted transfers that may be avoided under Chapter 5 of the Bankruptcy Code and applicable state law. These transfers are deemed preserved for the benefit of the estate, meaning that the Trustee must now administer this property for the benefit of Joseph Gilkey's creditors. Sadly, the creditor body in this chapter 7 case does not include the governmental unit claimants that hold extensive non-dischargeable claims and none of the proceeds of the Fountain Property will go to pay the tax claims of the United States and the State of Kansas, leaving Joseph at those creditors' mercy outside the bankruptcy process.

Judgment should therefore be entered for Trustee on his complaint avoiding the 2004 Deed as a fraudulent transfer under § 544(b) and KAN. STAT. ANN. § 33-204(a)(1);[42] avoiding the 2007 Deed as an unauthorized post-petition transfer under § 549, and preserving both transfers for the benefit of the estate under § 550(a). Costs should be assessed to the defendants. A Judgment on Decision will issue this day.

# # #

---

[42] Because the Court finds for the Trustee and avoids the 2004 Deed as a fraudulent transfer, the Court need not reach the Trustee's request to sell the jointly owned property under § 363(h).

-20-

Case 08-05009    Doc# 33    Filed 01/21/09    Page 20 of 20